**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

51382 GRATIOT AVENUE HOLDINGS, LLC,

      Plaintiff/Counter-Defendant,

v.                               Case No. 2:11-cv-12047

CHESTERFIELD DEVELOPMENT
COMPANY, LLC and JOHN DAMICO,

      Defendants/Counter-Plaintiffs/
      Third-Party Plaintiffs,

v.

MORGAN STANLEY MORTGAGE CAPITAL
HOLDINGS, LLC,

      Third-Party Defendant.

                                    /

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ON THE COMPLAINT, GRANTING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS, AND
DIRECTING DEFENDANTS TO SHOW CAUSE WHY THIRD-PARTY
CLAIMS SHOULD NOT BE DISMISSED**

      In December 2009, Defendant Chesterfield Development Co. ("Chesterfield")

defaulted on a commercial mortgage loan held by Plaintiff 51382 Gratiot Avenue

Holdings, LLC ("Gratiot").  Plaintiff subsequently foreclosed on the shopping center

securing the loan and filed this suit.  Presently, the claims remaining in the case

concern Plaintiff's right to the deficiency between the balance owed on the loan and the

value of the foreclosed property—an amount in excess of $12,000,000.  Before the

court is Plaintiff's affirmative motion for summary judgment on the complaint, which

asserts that the loan contract allows it to recover the deficiency from both Chesterfield

and the guarantor of the loan, Defendant John Damico.  Also pending is Plaintiff's

motion for summary judgment on Defendants' counterclaims, all of which concern

Defendants' liability for the deficiency.  Both motions have been fully briefed, and the

court heard oral argument on November 16, 2011.  For the following reasons, the court

will grant Plaintiff's motion for summary judgment on the complaint, grant Plaintiff's

motion for summary judgment on the counterclaims, and direct Defendants to show

cause why their third-party claims should not be dismissed.

## I.  BACKGROUND[1]

On April 13, 2005, Chesterfield obtained a $17,000,000 commercial mortgage

loan (the "Loan") from Plaintiff's predecessor-in-interest, Third-Party Defendant Morgan

Stanley Mortgage Capital Holdings, LLC ("Morgan Stanley").  (Hundertmark Aff. ¶ 3,

Dkt. # 3-2.)  To secure the loan, Chesterfield mortgaged the Chesterfield Village Square

shopping center (the "Property"), located at the corner of Gratiot Avenue and 23 Mile

Road in Chesterfield Township, Michigan.  The terms of the loan were memorialized in

several documents (collectively, the "Loan Agreement") executed by Chesterfield

("Borrower") and Morgan Stanley ("Lender"), including a Promissory Note for the

principal sum of $17,000,000 (the "Note"), a Mortgage for the Property (the "Mortgage"

or "Security Instrument"), and a Guaranty of Recourse Obligations of Borrower signed

---

[1]Throughout its filings, Plaintiff relies on the previously filed Consolidated Findings of Fact as crucial admissions of Defendants, most notably claiming that Defendants have conceded the key issue of whether Chesterfield was insolvent and/or had failed to pay its debts and liabilities for the purposes of the Loan Agreement.  This reliance is misplaced.  The Consolidated Findings of Fact were jointly submitted to the court "for purposes of the evidentiary hearing on Plaintiff's Motion for Appointment of Receiver and Preliminary Injunction," (Consolidated Findings of Fact 1, Dkt. # 20), and thus do not bind Defendants in the current summary judgment proceedings.

2

by Damico (the "Guaranty"). The Loan Agreement was subsequently assigned to Plaintiff, effective August 22, 2010. (*Id.* ¶ 11.)

As of December 1, 2009, Chesterfield stopped making the monthly payments required by the Loan Agreement. (*Id.* ¶ 15.) On April 9, 2010, Plaintiff sent Chesterfield a notice of default stating that the maturity of the Loan had been accelerated and demanding payment in full of the amount due. (Demand Letter, Dkt. # 36-8.) Chesterfield did not pay the accelerated Loan balance, (Hundertmark Aff. ¶ 19), and Plaintiff foreclosed its mortgage by advertisement, (*id.* ¶ 21). On April 1, 2011, the Property was sold at public auction to Plaintiff for $7,600,000. (*Id.*)

On May 10, 2011, Plaintiff invoked the court's diversity-of-citizenship jurisdiction to file this suit against Chesterfield, seeking, among other claims, judgment for the amount due on the Note less the price paid by Plaintiff to purchase the Property at the foreclosure sale. (*See* Compl. ¶¶ 23-29, Dkt. # 1.) In the complaint, Plaintiff also requested that the court appoint a receiver to manage the Property for the six-month statutory redemption period during which Chesterfield remained in possession. (*See id.* ¶¶ 41-50; *see also* Mot. Appoint Receiver, Dkt. # 3.) Plaintiff added Damico as a Defendant via an amended complaint filed on June 8, 2011, alleging that the Guaranty made Damico liable for payment in full of the Loan. (Am. Compl. ¶¶ 62-71, Dkt. # 24.)

The court appointed a receiver to manage the Property by a stipulated order entered on June 10, 2011. (Stip. & Order Grant. Mot. Appoint Receiver, June 10, 2011, Dkt. # 28). On June 27, 2011, Plaintiff filed the instant motion for summary judgment on its claims for judgment on the Note and the Guaranty, (Mot. Summ. J. 1, Dkt. # 36), seeking recovery of the $12,240,108.64 deficiency between the amount due on the

3

Note and the value of the Property, (Br. Supp. Mot. Summ. J. 16-17, Dkt. # 36).  While Plaintiff's motion was pending, the court terminated the receivership, again by stipulated order, (*see* Stip. & Order Term. Receivership., Oct. 20, 2011, Dkt. # 75), after title to the Property vested in Plaintiff on October 1, 2011.  The receivership proceedings have settled all of Plaintiff's claims except for its request for a deficiency judgment from both Chesterfield and Damico.

After Plaintiff filed its amended complaint, Defendants filed a counterclaim and third-party complaint that states six counterclaims and third-party claims: (I) breach of contract as to Plaintiff; (II) breach of covenant of good faith and fair dealing as to Plaintiff; (III) fraud/intentional misrepresentation as to Third-Party Defendant; (IV) fraud in the inducement as to Plaintiff and Third-Party Defendant; (V) request for declaratory relief as to Plaintiff; and (VI) reformation as to Plaintiff and Third-Party Defendant.  (Am. Counterclaim & 3d Party Compl., Dkt. # 81.)  On August 22, 2011, Plaintiff filed the instant motion for summary judgment on the counterclaims contained in Counts I, II, IV, V, and VI.  (Mot. Summ. J. Defs.' Countercls., Dkt. # 49.)  The court combined both of Plaintiff's summary-judgment motions for briefing; Defendants have since filed a response, Plaintiff a reply, and Defendants, with leave of the court, a sur-reply.  After the court heard oral argument on November 16, 2011, both Defendants and Plaintiff filed an additional, supplemental brief, again with leave of the court.

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When

4

deciding a motion for summary judgment, the court "is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* at 497 (quoting *Anderson*, 477 U.S. at 251-52). "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [movant] is entitled to a verdict . . . ." *Anderson*, 477 U.S. at 252.

The party seeking summary judgment has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop. L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

5

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id.* 56(c)(1)(B).  "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan*, 342 F.3d at 497 (citing *Matsushita*, 475 U.S. at 587).

## III. DISCUSSION

The primary dispute between Plaintiff and Defendants is whether the Loan Agreement holds Defendants liable for the deficiency between the amount still due on the Loan and the value of the Property at the time of the foreclosure.  This is the subject of Plaintiff's affirmative motion for summary judgment on the complaint; Defendants' response—titled (but not docketed as) a "Cross-Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(f)(1)"—also contains a request for summary judgment on this point.  *See* Fed. R. Civ. P. 56(f)(1) ("After giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant.").  Because the Loan Agreement unambiguously provides that Defendants are liable for the deficiency balance, the court will grant summary judgment to Plaintiff on the complaint.  In light of this decision, the court will also grant summary judgment on Defendants' counterclaims, which essentially amount to affirmative defenses to Plaintiff's breach-of-contract claims. Finally, since this disposition leaves only third-party claims largely duplicative of Defendants' counterclaims, the court will direct Defendants to show cause why those claims should not be dismissed.

6

**A.  Choice of Law**

In this diversity action, the court applies the substantive law of the forum state—here, Michigan. *See Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003) ("Because we are sitting in diversity, *see* 28 U.S.C. § 1332, we apply the law, including the choice of law rules, of the forum state." (footnote omitted) (citing *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001))).  Additionally, the parties have agreed that Michigan law governs the interpretation and enforcement of the Loan Agreement.  *See Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006) ("Michigan's public policy favors the enforcement of contractual forum-selection clauses and choice-of-law provisions." (citing *Offerdahl v. Silverstein*, 569 N.W.2d 834, 835 (Mich. Ct. App. 1997))).  The Note and Mortgage both provide that those instruments "shall be governed, construed, applied and enforced in accordance with the laws of the State of Michigan."  (Note art. 13, Dkt. # 36-3; Mortgage § 17.1, Dkt. # 36-5.) The Guaranty also designates Michigan law as controlling.  (*See* Guaranty ¶ 19, Dkt. # 36-2 ("This Guaranty shall be deemed to be a contract entered into pursuant to the laws of the Property State and shall in all respects be governed, construed, applied and enforced in accordance with applicable federal law and the laws of the Property State, without reference or giving effect to any choice of law doctrine.").)

**B.  Plaintiff's Claim for a Deficiency Judgment**

Both Plaintiff and Defendants request summary judgment on Plaintiff's claims that Defendants are liable for the deficiency under the Loan Agreement, advancing opposing interpretations of that contract.   The court concludes that, under the unambiguous terms of the Loan Agreement, Plaintiff is entitled to collect a deficiency

7

judgment from Defendants.  Accordingly, the court will grant Plaintiff summary judgment on the complaint.

### 1. *Standards of Contract Interpretation*

"The primary goal in interpreting contracts is to determine and enforce the parties' intent."  *Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 666-67 (Mich. Ct. App. 2000) (citing *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994)). "In ascertaining the meaning of a contract, [the court] give[s] the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument."  *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 28 (Mich. 2005) (citing *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003)).  Additionally, a contract must be "construed as a whole"; "[e]very word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." *Associated Truck Lines, Inc. v. Baer*, 77 N.W.2d 384, 386 (Mich. 1956) (quoting *Laevin v. St. Vincent de Paul Soc'y*, 36 N.W.2d 163, 164 (Mich. 1949)) (internal quotation marks omitted).

If, in applying these principles, a court determines that "the contractual language is unambiguous, [it] must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law."  *In re Smith Trust*, 745 N.W.2d 754, 758 (Mich. 2008) (citing *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999)).  That is, "the judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties," *Rory*, 703 N.W.2d at 26, as such an approach would be "contrary to the

8

bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy," *Wilkie*, 664 N.W.2d at 782. Accordingly, a court may not consider extrinsic evidence of the parties' intent to vary the meaning of a contract that is clear and unambiguous. *Burkhardt v. Bailey*, 680 N.W.2d 453, 464 (Mich. Ct. App. 2004).

However, if the court concludes that the terms of a contract are ambiguous, "a factual question is presented as to the meaning of its provisions." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003). "A contract is ambiguous when two provisions 'irreconcilably conflict with each other,'" *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 543 (Mich. Ct. App. 2007) (quoting *Klapp*, 663 N.W.2d at 453), "or 'when [a term] is equally susceptible to more than a single meaning,'" *id.* (alteration in original) (quoting *Mayor of Lansing v. Mich. Pub. Serv. Comm.*, 680 N.W.2d 840, 847 (Mich. 2004)). Additionally, a contract suffers from a "latent ambiguity" when "the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the 'necessity for interpretation or a choice among two or more possible meanings.'" *Shay v. Aldrich*, 790 N.W.2d 629, 641 (Mich. 2010) (quoting *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 344 (Mich. 1964)). The court "cannot create ambiguity where the terms of the contract are clear." *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005) (Cavanagh, J., writing for an equally divided court) (internal quotation marks omitted). "[I]f a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear."

9

*Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 314 N.W.2d 440, 441 (Mich. 1982).

Furthermore, "the parties' disagreement regarding the meaning of contract language

does not, by itself, create an ambiguity." *Harbor Park Market, Inc. v. Gronda*, 743

N.W.2d 585, 589 n.3 (Mich. Ct. App. 2007) (citing *Gortney v. Norfolk & W. Ry. Co.*, 549

N.W.2d 612, 615 (Mich. Ct. App. 1996)).

### 2. Relevant Provisions of the Loan Agreement and the Parties' Dispute

The question of whether Defendants are personally liable for the deficiency

hinges on Article 11 of the Note, titled "Exculpation." Plaintiff and Defendants

essentially agree on the basic operation of Article 11. Subsection (a) of Article 11

contains a provision insulating Chesterfield from personal liability for the debt:

> Notwithstanding anything to the contrary contained in this Note, the Security
> Instrument or any Other Security Document (but subject to the provisions of
> subsections (b), (c) and (d) of this Article 11), Lender shall not enforce the
> liability and obligation of Borrower to perform and observe the obligations
> contained in this Note or the Security Instrument by any action or proceeding
> wherein a money judgment or any deficiency judgment or other judgment
> establishing any personal liability shall be sought against Borrower . . . .
> Lender, by accepting this Note and the Security Instrument, agrees that it
> shall not, except as otherwise provided in this Article 11, sue for, seek or
> demand any deficiency judgment against Borrower . . . , in any such action
> or proceeding, under or by reason of or under or in connection with this Note,
> the Security Instrument or the Other Security Documents.

(Note art. 11(a), Dkt. # 36-3.) In the terminology of the parties, Article 11(a) limits the

"recourse" character of the Loan, that is, it restricts Plaintiff's "right to repayment of [the]

loan from [Chesterfield's] personal assets, not just from the collateral that secured the

loan." *Black's Law Dictionary* (9th ed. 2009) (defining "recourse"). However, Article

11(a) is "subject to" Article 11(b) and (c), (*see* Note art. 11(a)), which list circumstances

that nullify in whole or in part the limitation on Chesterfield's recourse liability. In

10

particular, Article 11(c) designates several "springing recourse obligation[s]," (Br. Supp.
Mot. Summ. J. 9, Dkt. # 36), the occurrence of which trigger full recourse liability for
Chesterfield: "[n]otwithstanding the foregoing, the agreement of Lender not to pursue
recourse liability as set forth in subsection (a) above SHALL BECOME NULL AND VOID
and shall be of no further force and effect and the Debt shall be fully recourse to
Borrower in the event that: [enumerated conditions occur]," (Note art. 11(c)).  Thus, and
as both parties acknowledge, under Article 11(a) Plaintiff cannot hold Chesterfield
personally liable for a deficiency judgment on the Note unless Chesterfield triggered one
of the conditions enumerated in Article 11(b) or (c).[2]

Additionally, Plaintiff asserts, and Defendants do not contest, that the Guaranty
executed by Damico makes his liability for the debt coextensive with Chesterfield's
personal liability.  Under the terms of the Guaranty, Damico "absolutely and
unconditionally guarantees to Lender the prompt and unconditional payment" of "all
obligations and liabilities of Borrower for which Borrower shall be personally liable

---

[2]In its reply brief, Plaintiff takes issue with Defendants' characterization of the
loan as nonrecourse, claiming that the term appears nowhere in the loan documents.
Like Defendants, the court finds this argument unconvincing.  Article 11(c) expressly
characterizes the covenant in Article 11(a) as an "agreement of Lender not to pursue
recourse liability," (Note art. 11(c)), Section 18.2 of the Mortgage references the "non-
recourse provisions of the Loan," (Mortgage § 18.2), and Plaintiff itself characterizes
Article 11(c) as containing "springing recourse obligation[s]" under which "Borrower or
Guarantor is not liable for the full amount of the debt unless certain events . . . occur
that cause full recourse liability to be triggered," (Br. Supp. Mot. Summ. J. 9, Dkt. # 36).
Article 11(a) clearly contemplates that, unless subsections (b), (c), or (d) apply, the
Loan was nonrecourse, or "[a] secured loan that allows the lender to attach only the
collateral, not the borrower's personal assets, if the loan is not repaid."  *Black's*, *supra*
(defining "nonrecourse loan").  Moreover, the court views this dispute as merely one of
semantics, as both parties' filings reflect their understanding that Article 11 functioned in
the manner described.

pursuant to Article 11 of the Note." (Guaranty ¶¶ 1, 4.) Therefore, it is undisputed that if Chesterfield is liable for the deficiency, so is Damico.[3]

The parties' point of contention is whether Chesterfield actually incurred full recourse liability under Article 11(c) by violating a covenant contained in the Mortgage. Article 11(c)(ii) of the Note contains a springing recourse obligation that required Chesterfield to abide by certain provisions of the Mortgage, stated as follows: "(ii) Borrower . . . fails to comply with any provision of Section 4.2 of the Security Instrument (other than subsection (i), (r), or (x) thereof) . . . ." (Note art. 11(c)(ii).) One such provision of the Mortgage, Section 4.2(j), states that Chesterfield shall not "become insolvent or fail to pay its debts and liabilities from its assets as the same shall become due." (Mortgage § 4.2(j), Dkt. # 36-4.) Accordingly, it is clear on the face of the Note that, if Chesterfield did not comply with Section 4.2(j), Plaintiff's agreement "not to pursue recourse liability as set forth in" Article 11(a) is rendered "NULL AND VOID."

Plaintiff avers that Chesterfield's failure to make payments on the Loan, and its resulting default under the Loan Agreement, violates Section 4.2(j). Therefore, Plaintiffs

---

[3]Both parties address in their briefs a statement to the opposite effect, made by Plaintiff's corporate representative, Michael McQuarters, in his deposition. At the culmination of a series of questions by Defendants' counsel, McQuarters responded in the affirmative when asked if "plaintiff's position is that even though the borrower is not personally liable for that additional amount, the guarantor based on the guaranty is personally liable." (*See* McQuarters Dep. 77:9-80:10, Sept. 26, 2011, Dkt. # 69-13.) Defendants would have the court treat this as an admission that neither Chesterfield nor Damico is personally liable for the deficiency on the Loan, given "the plain language of the Guaranty." (Br. Opp. Mots. Summ. J. 19 n.6, Dkt. # 69.) As McQuarters's statement is a legal conclusion, it is inappropriate to consider it a judicial admission. *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) ("Judicial admissions of fact must be deliberate and clear, while legal conclusions are rarely considered to be binding judicial admissions." (citing *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997))).

argue, Defendants face full recourse liability under Article 11(c)(ii), meaning they are personally liable for the deficiency on the Loan.  On the other hand, Defendants maintain that Chesterfield did not, and indeed could not, incur recourse liability solely due to nonpayment of the Loan.  In their view, the mortgage debt does not factor into a determination of Chesterfield's solvency or its ability to pay its debts and liabilities under Section 4.2(j) unless a springing recourse event has occurred.  In a nutshell, Plaintiff contends that Chesterfield's failure to pay the Loan violates Section 4.2(j) and triggers Defendants' recourse liability, whereas Defendants assert that they must otherwise trigger recourse liability before Chesterfield can violate Section 4.2(j).  Luckily, unlike the classic, chicken-or-egg dilemma, this "which came first" scenario has a clear resolution, as the terms of the Loan Agreement unambiguously show that Plaintiff is correct.

### 3. The Terms of the Loan Agreement Support Plaintiff's Interpretation

At first blush, the Loan Agreement favors Plaintiff's interpretation that Defendants are personally liable on the Note under Section 4.2(j) as a result of Chesterfield's failure to pay the mortgage debt.  Section 4.2(j) has two prongs: Chesterfield cannot "become insolvent" or "fail to pay its debts and liabilities from its assets as the same shall become due."  Plaintiff persuasively argues that Chesterfield violated both of these prongs when it failed to make the Loan payments required by the Loan Agreement, as Plaintiff's reading gives effect to the "plain and ordinary meaning" of the contract, *Rory*, 703 N.W.2d at 28, and can be reconciled with the Loan Agreement "as a whole," *Associated Truck Lines*, 77 N.W.2d at 386.

*a. Plaintiff's Reading of Section 4.2(j) Is Consistent With the Contract's Plain Meaning*

13

The relevant terms of Section 4.2(j)—"insolvent," "debts," and "liabilities"—have clearly defined meanings that, when applied to Chesterfield's nonpayment of the Loan, indicate a violation of that provision. *See Macomb Cnty. v. AFSCME Council 25 Locals 411 & 893*, --- N.W.2d ----, 2011 WL 4374991 (Mich. Ct. App. 2011) (Markey, J., dissenting) ("A term in a statute or contract is not rendered ambiguous because it is undefined. Rather, words are construed according to their plain and ordinary meaning, with consultation to a dictionary if necessary, unless it is clear a term is a legal term of art having peculiar meaning."). "Insolvent" is "a well defined commercial term and legal term of art" that generally should be interpreted "in accord with [its] specialized or accepted usage." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1013 (3d Cir. 1980). Plaintiff relies upon, and Defendants do not contest the use of, the definition of insolvency in the Michigan Uniform Fraudulent Transfer Act ("UFTA"), which provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Mich. Comp. Laws § 566.32(1); *cf.* 11 U.S.C. § 101(32)(A) (defining "insolvent" for the purposes of the Bankruptcy Code as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation"); *Black's*, *supra* (defining "insolvent" as "having liabilities that exceed the value of assets" or "having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due"). A "debt" for the purposes of a solvency determination under the UFTA is a "liability on a claim," Mich. Comp. Laws § 566.31(e); *see also* 11 U.S.C. § 101(12); *Black's*, *supra*, with "liability" in this context taking on its general meaning of "[t]he quality or state of being legally obligated or accountable," *Black's*, *supra*, and "claim" meaning "a right to

14

payment," Mich. Comp. Laws § 566.31(c); *see also* 11 U.S.C. § 101(5)(A); *Black's*,

*supra*. "'Asset' means property of a debtor." Mich. Comp. Laws § 566.31(b); *cf.*

*Black's*, *supra* (defining "assets" as "[a]ll the property of a person (esp. a bankrupt or

deceased person) available for paying debts or for distribution"). "Debts" and "liabilities"

as used in Section 4.2(j) are not clearly legal terms of art having a peculiar meaning, but

rather are common, well understood terms in every day use. A "debt" is "that which is

owed or due; anything (as money, goods, or service) which one person is under

obligation to pay or render to another." *Oxford English Dictionary* (2d ed. 1989)

[*hereinafter OED*]. A "liability" is, simply, a "financial or pecuniary obligation." *Black's*,

*supra*; *see also OED*, *supra* (defining "liability" as "the debts or pecuniary obligations of

a person or company").

    Under the "fail to pay" prong of Section 4.2(j), Plaintiff maintains that

Chesterfield's obligation to repay the Loan is a "debt[]" or "liabilit[y]" that Chesterfield

"fail[ed] to pay . . . from its assets as the same shall become due" when it stopped

making payments on the Note. This interpretation aligns with the common definitions of

"debts" and "liabilities" as legal or financial obligations. As part of the Loan Agreement,

Chesterfield "unconditionally promise[d] to pay . . . the principal sum of

($17,000,000.00), . . . with interest . . . in accordance with the terms of th[e] Note."

(Note pmbl.) Article 1 of the Note requires Chesterfield to make "a constant payment

of . . . ($103,483.14) . . . on the first day of each calendar month" between June 1, 2005

and April 1, 2015. (*Id.* art. 1(b).) In the most basic sense, these provisions of the Loan

Agreement imposed on Chesterfield an obligation to repay the Loan in the manner

specified. Consequently, Chesterfield had a "debt[]" or "liabilit[y]" that, under the terms

15

of the Loan Agreement, "bec[a]me due" on the first day of each month.  As of December 1, 2009, Chesterfield stopped making these payments, "from its assets" or otherwise. The terms of Section 4.2(j) prohibit Chesterfield from failing to pay in this manner.

Moreover, Plaintiff also provides evidence that Chesterfield violated the "insolvent" prong as a result of Chesterfield's default due to nonpayment.  On April 9, 2010, Plaintiff exercised its option under the Loan Agreement to accelerate the Loan, and notified Chesterfield that it must be repaid in full.  (*See* Note art. 3 ("[I]f . . . any payment required hereunder . . . is not paid prior to the fifth (5th) day after the same is due, . . . then at the option of Lender . . . the whole of the principal sum of this Note . . . shall without notice become immediately due and payable.").)  As of that date, Chesterfield's mortgage debt was equivalent to the entire balance due on the Loan. Through an affidavit prepared by Bruce Knapp, a certified public accountant ("CPA"), Plaintiff demonstrates that the amount due on the Loan—$15,432,191 as of December 31, 2010—far outweighed Chesterfield's assets, including the Property.  (Knapp Aff. ¶ 13, Ex. C, Dkt. # 58-1.)  Thus, "the sum of [Chesterfield's] debts [was] greater than all of [Chesterfield's] assets at a fair valuation," Mich. Comp. Laws § 566.32(1), and Chesterfield had "become insolvent" in violation of Section 4.2(j).

###### b. The Loan Agreement as a Whole Does Not Contradict Plaintiff's Interpretation

Defendants challenge Plaintiff's interpretation of Section 4.2(j) as overly broad, asserting that it causes the exception of Article 11(c)(ii) to swallow the rule of Article 11(a), essentially rendering Article 11(a) meaningless.  *See Ingham Cnty. Emps. Ass'n v. Young*, 311 N.W.2d 470, 472 (Mich. Ct. App. 1981) (noting that, when interpreting a contract, "the exception cannot be allowed to swallow the rule").  According to

16

Defendants, if Chesterfield's nonpayment of the Loan and the consequences of its default are enough to trigger Article 11(c)(ii), then the very occurrence giving rise to Plaintiff's ability to sue Chesterfield on the Note also makes Defendants liable for any deficiency.  In this scenario, Defendants claim that they could never benefit from the protection accorded them in Article 11(a), a result that goes against the court's obligation to construe the Loan Agreement "as a whole."  *Associated Truck Lines*, 77 N.W.2d at 386.

As Plaintiff recognizes, its interpretation of the "fail to pay" prong of Section 4.2(j) is far-reaching—broad enough, perhaps, to be triggered by a failure to timely pay even a trivial, outstanding financial obligation like a utility bill.  However, it does not nullify Article 11(a)'s covenant not to pursue recourse liability.  Defendants' argument assumes that the only way Chesterfield can default on the Loan is through nonpayment, when in fact Section 10.1 of the Mortgage proscribes numerous Events of Default, some of which do not involve nonpayment of a debt or liability.  (*See, e.g.*, Mortgage § 10.1(c), (e), (k), (*l*).)  Likewise, the acceleration of the Loan due to default does not necessarily violate the "insolvent" prong of Section 4.2(j).  Rather, such a violation depends upon the relative values of the Property and the amount due on the Loan at the time of default; while, as a result of Chesterfield's default, its liabilities exceeded the value of its assets because it owed more on the Loan than the Property was worth, insolvency would not have resulted if the value of the Property had been greater than the balance owing on the Loan.  Therefore, even if Defendants are correct that any default of the Loan Agreement due to nonpayment of the Loan will result in recourse liability under Article 11(c)(ii) and Section 4.2(j), this result does not write Article 11(a) out of the Loan

17

Agreement.  For example, Section 4.2(j) would not have triggered Defendants' recourse liability had Chesterfield's default occurred due to its failure to maintain adequate insurance on the Property, (*see* Mortgage § 10.1(c)), and the accelerated Loan balance had been less than the value of the Property.  Therefore, Plaintiff's reading of Section 4.2(j) can be "harmonized" with Article 11(a), and does not violate the interpretative principle that "no part [of a contract] is to be taken as eliminated or stricken by some other part unless such a result is fairly inescapable."  *Associated Truck Lines*, 77 N.W.2d at 386.

Defendants also assert that, allowing full recourse liability under Article 11(c)(ii) whenever Chesterfield misses a loan payment makes superfluous other springing recourse obligations in Article 11(c).  Specifically, Defendants argue that, if failure to make a loan payment leads to full recourse liability under Article 11(c)(ii), there would be no need of Article 11(c)(i), which provides that a springing recourse event occurs when "the first full monthly payment of principal and interest under this Note is not paid when due."  (Note art. 11(c)(i).)  Furthermore, Defendants contend, the springing recourse conditions of Article 11(c)(iv) through (vii), which relate to Chesterfield's filing of or acquiescence in a bankruptcy petition, would be redundant if full recourse liability were automatically triggered upon Chesterfield becoming insolvent.  While it does seem that the cited provisions would come into effect primarily, if not exclusively, under circumstances in which Defendants would also face full recourse liability under Article 11(c)(ii) and Section 4.2(j), this fact alone does not defeat Plaintiff's otherwise unambiguous interpretation of Section 4.2(j).  As Plaintiff points out, Article 11(c)(i) protects a different interest of a lender than Article 11(c)(ii): Article 11(c)(i) speaks to a

lender's interest in avoiding the adverse tax consequences that result when a borrower misses the first loan payment, while Article 11(c)(ii) protects a lender's interest in the collateral and the loan by ensuring that a borrower remains a single-purpose, bankruptcy-remote entity.  Subsections (iv) through (vii) of Article 11(c) proscribe affirmative acts of a borrower that do not necessarily occur when a borrower becomes insolvent but that uniquely threaten a lender's ability to recover on the Loan.  In light of the interests at stake, Lender was entitled to bargain for extra assurances that full recourse liability will result when the specific events of Article 11(c)(i), (iv), (v), (vi), and (vii) occur.  The fact that Lender ensured those provisions were contained in the Loan Agreement, along with the springing recourse obligation reflected in Article 11(c)(ii) and Section 4.2(j), does not change the plain meaning of Section 4.2(j).  *See Mich. Twp. Participating Plan v. Pavolich*, 591 N.W.3d 325, 330 (Mich. Ct. App. 1998) ("[A] finding of surplusage does not equate to a finding of ambiguity.").

Defendant's argument that Plaintiff's reading of Section 4.2(j) produces "extremely absurd," "ridiculous," and "draconian" results when compared with the partial recourse "carve-outs" contained in Article 11(b) is likewise unsound.  (Defs.' Br. Opp'n Pl.'s Mots. Summ. J. 26-27, Dkt. # 69.)  Article 11(b) provides that, notwithstanding Article 11(a), "Borrower shall be personally liable to Lender for Losses . . . Lender incurs due to" a number of misdeeds by Borrower or its agents, including, for example, "fraud or intentional misrepresentation . . . in connection with the Loan" or "gross negligence or willful misconduct."  (Note art. 11(b)(i), (ii).)  Defendant insists that, because Article 11(b) "contemplates only *partial recourse* liability in connection with egregious misconduct such as fraud or intentional misrepresentation," the parties could not have

19

intended the more onerous obligation of full recourse liability for nonpayment of the Loan, which they characterize as "an event over which Borrower and Guarantor have little or no control." (Defs.' Br. Opp'n Pl.'s Mots. Summ. J. 26-27, Dkt. # 69.) Not only is Defendants' argument premised on a mistaken understanding of Article 11(b) and (c), it fails as a matter of law. Even assuming, as Defendants do, that failure to make mortgage payments is less culpable conduct than the acts listed in Article 11(b), Article 11(b) does impose a harsher sanction than Article 11(c): Article 11(b) allows Lender to hold Borrower personally accountable for any losses resulting from the enumerated misconduct, regardless of whether the Loan Agreement is in default and without offsetting those losses against the value of the Property. In contrast, recourse liability under Article 11(c) comes into play only when the Borrower defaults on the Loan and the amount recovered through Lender's foreclosure of the Property is insufficient to satisfy the balance on the Loan. Regardless, and more importantly, even if the court disagreed with the Article 11's designation of certain events as springing recourse conditions instead of partial recourse carve-outs, or vice versa, that designation is unambiguous, and "a court may not revise or void the unambiguous language of the agreement to achieve a result that it views as fairer or more reasonable." *Rory*, 703 N.W.2d at 489; *see also Wilkie*, 664 N.W.2d at 787-88 ("[T]he parties are generally free to agree to whatever they like, and, in most circumstances, it is beyond the authority of the courts to interfere with the parties' agreement." (footnote omitted) (citing *St. Clair Intermediate Sch. Dist. v. Intermediate Educ. Ass'n*, 581 N.W.2d 707, 722-23 (Mich. 1998))).

### 4. Defendants Cannot Establish an Ambiguity in the Loan Agreement

20

For the reasons outlined in the previous section, the plain meaning of the Loan Agreement, when considered alongside the tenets of interpretation that the court must apply when discerning the meaning of a contract, aligns with Plaintiff's reading of Section 4.2(j).  The court is bound to enforce the Loan Agreement accordingly, unless Defendants can establish an ambiguity in the contract.  Defendants attempt to do so both by advancing an opposing interpretation, *see Klapp*, 663 N.W.2d at 453 ("'[A] contract is ambiguous when its provisions are capable of conflicting interpretations.'" (quoting *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999))), and by arguing that extrinsic evidence reveals a latent ambiguity in the Loan Agreement, *see City of Grosse Point Park*, 702 N.W.2d at 113 ("Because 'the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist.'" (quoting *McCarty*, 127 N.W.2d at 344)).  Neither approach can overcome the plain meaning of the Loan Agreement, and the court finds that Plaintiff's interpretation is unambiguous.

> a. *Defendants' Interpretation of the Loan Agreement is Unreasonable*

The driving principle behind Defendants' interpretation of the Loan Agreement is that a failure to make payments on the Loan, in and of itself, could never result in recourse liability for Defendants under Article 11(c)(ii) and Section 4.2(j).  Primarily, Defendants argue that the mortgage debt is not a "debt[]" or "liabilit[y]" the nonpayment of which can constitute a "fail[ure] to pay . . . from [Chesterfield's] assets as the same shall become due" or render Chesterfield insolvent.  Specifically, because under Article 11(a) Chesterfield was not personally liable for the debt beyond the value of the

21

Property—provided, of course, that none of the conditions in Article 11(b) or (c) applied—Chesterfield discharged its obligation to pay the debt by surrendering the Property in foreclosure.

To evaluate Defendants' interpretation, it is crucial to distinguish two distinct concepts: Chesterfield's obligation to pay the Loan and Plaintiff's right to recovery in the event of default.  As discussed above, Chesterfield unquestionably has an obligation to repay the Loan in full, as it "unconditionally promise[d[ to pay" the Loan according to the terms of the Loan Agreement.  (Note art. 1(b).)  On the other hand, Article 11(a) limits Plaintiff's ability to "enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Note or the Security Instrument" by limiting Defendants' recourse liability to the events enumerated in Article 11(b) and (c).  (*Id.* art. 11(a).)  The crux of Defendants' argument is that Chesterfield's obligation to pay the Loan was no greater than Plaintiff's right to a recovery in the event of default.  Given the limitation on that right to recovery in Article 11(a), Defendants reason, Chesterfield's obligation did not exceed the value of the Property and thus could never cause a violation of Section 4.2(j).

Defendants' contention gains some traction in the context of a solvency analysis under the "insolvent" prong of Section 4.2(j), which involves an assessment of Chesterfield's "debt" according to the specialized, legal definition of "liability on a claim." That definition of "debt" limits Chesterfield's obligation to pay the Loan to Plaintiff's right to recovery.  Therefore, as the Defendants' affidavit of CPA Harry Cendrowski illustrates, if the mortgage debt was a nonrecourse liability at the time of Chesterfield's default on the Loan, the amount of that liability is limited to "the fair value of the property

22

which collateralizes the loan" and Chesterfield's debts did not exceed its assets.
(Cendrowski Aff. ¶¶ 8, 12, Dkt. # 69-15.)

However, Defendants' reasoning falls flat in the face of the "fail to pay" prong of
Section 4.2(j), which is broader than the "insolvent" prong. *Compare* Mich. Comp. Laws
§ 566.32(1) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of
the debtor's assets at a fair valuation."), *with id.* § 566.32(2) ("A debtor who is generally
not paying his or her debts as they become due is presumed to be insolvent.").  As
discussed above, a "debt" is "anything (as money, goods, or service) which one person
is under obligation to pay or render to another," *OED*, *supra*, and a "liability" is a
"financial or pecuniary obligation," *Black's*, *supra*.  These definitions, unlike the
operative definition of "debt" in the insolvency context, do not limit Chesterfield's
obligation to pay to their lenders' legal right to recovery.  To hold otherwise would
collapse these two separate concepts in a manner not allowed on the face of the Loan
Agreement, which specifically provides in Article 11(a) that "[t]he provisions of this
Article 11 shall not . . . constitute a waiver, release or impairment of any obligation
evidenced or secured by this Note, the Security Instrument or the Other Security
Documents delivered to Lender."  (Note art. 11(a)(i); *cf. id.* art. 11(d) ("Nothing herein
shall be deemed to be a waiver of any right which Lender may have under Section
506(a), 506(b), 1111(b) or any other provision of the U.S. Bankruptcy Code to file a
claim for the full amount of the indebtedness secured by the Security Instrument . . . .").)


Put simply, Chesterfield had an obligation to repay the Loan in full, not an
obligation to make payments on the Loan until doing so became financially undesirable

or unfeasible and then await a foreclosure action.  Because Chesterfield's obligation to

pay cannot be conflated with Plaintiff's right to recovery when determining Chesterfield's

"debts and liabilities" for the purposes of the "fail to pay" prong of Section 4.2(j),

declining to count the full amount of Chesterfield's indebtedness to Plaintiff as part of

those "debts and liabilities" would be tantamount to rewriting Section 4.2(j) to read

"become insolvent or fail to pay its debts and liabilities *except for its obligations under*

*the Loan Agreement* from its assets as the same shall become due."  This, of course, is

an untenable result.  *See Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 944 (6th

Cir. 1993) ("Under Michigan law, 'the office of interpretation or construction is to

ascertain the intention of the parties *from the words which have been used; [The court*

*is] not at liberty to insert words* which have been omitted, and which are not to be found

in the instrument.'" (alteration in original) (quoting *Wash. Cnty. Bank v. Jerome*, 8 Mich.

490, 491 (1860))).

     Defendants respond that, even if the entirety of the mortgage debt falls within the

"debts and liabilities" referred to in Section 4.2(j), Chesterfield never "fail[ed] to pay [the

mortgage debt] . . . from its assets as the same shall become due."  Defendants assert

that "Borrower does not violate section 4.2(j) simply by failing to pay its debts and

liabilities as they become due"; rather, "breach occurs only if Borrower fails to pay its

debts and liabilities *from its assets*," and Chesterfield did not breach because "it has

used the assets that it has to pay its debts and liabilities."  (Br. Opp. Mots. Summ. J. 26

n.13, # 69.)  Put another way, Chesterfield cannot "fail to pay its debts and liabilities"

within the meaning of Section 4.2(j) if it runs out of assets with which to pay.  This

argument is entirely unavailing.  Defendants maintain that, because Plaintiff contends

that breach occurs if Chesterfield fails to pay its debts and liabilities as they become due, Plaintiff reads the phrase "from its assets" out of Section 4.2(j), and Defendants' interpretation is therefore superior.  However, interpreting Section 4.2(j) to prohibit the nonpayment of "debts and liabilities" only when Chesterfield has assets available would negate the phrase "as the same shall become due."  Section 4.2(j) must require Chesterfield to pay its debts and liabilities *both* "from its assets" *and* "as the same shall become due," otherwise one of these phrases is written out of the contract.  *Associated Truck Lines*, 77 N.W.2d at 386 (listing as "cardinal principle[s] of construction" that "a contract is to be construed as a whole" and "every word in it is to be given effect").  Chesterfield had an obligation under the Loan Agreement to make a set monthly payment for a period of years, and that payment "bec[a]me due" on the first of every month.  On December 1, 2009, Chesterfield failed to pay this obligation, from its assets or otherwise, as required.

At the motion hearing, Defendants made the additional, eleventh-hour argument that, because the "fail to pay" prong of Section 4.2(j) refers to "debts and liabilities" in the plural, Chesterfield did not violate it because it only failed to pay a single debt, the mortgage debt.  This, too, will not carry the day, as it is contradicted by the plain meaning of Section 4.2(j).  In common parlance, use of the plural in the phrase "fail[ing] to pay its debts and liabilities" means that Chesterfield's obligation to pay encompasses all of its "debts and liabilities," such that failure to pay one such "debt" or "liability" means that Chesterfield is not paying its "debts and liabilities" as required.  Defendants have failed to present an alternative reading of the "fail to pay" prong of Section 4.2(j)

25

that is reasonable on the face of the contract, and the Loan Agreement is not for that reason unambiguous.

b. *Extrinsic Evidence Does Not Reveal a Latent Ambiguity in the Loan Agreement*

Defendants also present several pieces of extrinsic evidence that they claim establish a latent ambiguity in the Loan Agreement. A latent ambiguity "'arises not upon the words of the will, deed or other instrument, as looked at in themselves, but upon those words when applied to the object or to the subject which they describe.'" *Shay*, 790 N.W.2d at 643 (quoting *Hall v. Equitable Life Assurance Soc'y of the U.S.*, 295 N.W. 204, 206 (Mich. 1940)). "To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation." *Id.* at 641. Typically, latent ambiguities arise in such circumstances as confusion regarding the identity of the intended beneficiary of an instrument. *See, e.g.*, *id.* at 643-44 (determining from extrinsic evidence that use of broad term "persons" in release executed pursuant to settlement agreement did not include co-defendants not party to the settlement agreement); *In re Kremlick Estate*, 331 N.W.2d 228 (1983) (using extrinsic evidence to conclude that decedent intended to bequeath half his estate to "Michigan Division of the American Cancer Society" as opposed to named beneficiary "Michigan Cancer Society").

The extrinsic evidence proffered by Defendants does not reveal a latent ambiguity in the Loan Agreement. Defendants put forth several different pieces of evidence—the mortgage loan application, the commitment letter, an affidavit from the

26

individual who acted as the mortgage broker for Chesterfield in its transaction with

Morgan Stanley, and an affidavit from Damico—that they claim indicate both

Chesterfield and Morgan Stanley's intent that nonpayment of the Loan would not

precipitate full recourse liability.  However, the extent of Defendants' personal liability

under the Loan Agreement is not a collateral matter that could give rise to a latent

ambiguity; rather, it is a function of the terms of the contract.  As already determined,

those terms unambiguously provide that a failure to make Loan payments as required

by the Loan Agreement nullifies Plaintiff's covenant not to pursue recourse liability.

Extrinsic evidence cannot be used to vary unambiguous contractual language.

*Burkhardt*, 680 N.W.2d at 464.

 Defendants also point to Cendrowski's affidavit, which contains the CPA's

evaluation of Chesterfield's assets, debts, and liabilities for the purposes of Section

4.2(j).  Although Cendrowski's financial analysis does apply the terms of the Loan

Agreement to the circumstances surrounding Chesterfield's default, and thus could

potentially unearth a latent ambiguity, it fails to do so.  As previously discussed,

Cendrowski's analysis shows only that, if Article 11(a)'s exculpation provision was in

effect at the time of Chesterfield's default, Chesterfield did not "become[] insolvent" as a

result of that default.  (Cendrowski Aff. ¶¶ 9, 12-16.)[4]  The analysis does not dispute the

conclusion that Chesterfield's failure to make its monthly mortgage payments did in fact

---

 [4]Cendrowski also opines in his affidavit that "Chesterfield was solvent" and "Chesterfield did not fail to pay its debts and liabilities from its assets as they came due."  (Cendrowski Aff. ¶¶ 17, 21.)  These are legal conclusions offered in the guise of opinion testimony, and they therefore cannot create an issue of fact.  It is for the court to determine the meaning of the Loan Agreement.

trigger Defendant's full recourse liability under Article 11(c)(ii) and the "fail to pay" prong of Section 4.2(j), so that the Loan was fully recourse when Chesterfield defaulted. Thus, Cendrowski's analysis is entirely consistent with Plaintiff's unambiguous interpretation of the Loan Agreement, which the court will enforce as written.

### 5.  Public Policy

Finally, it is necessary for the court to briefly address an issue to which Defendants devoted the majority of their briefing and of their argument at the motion hearing: the contention that Plaintiff's interpretation of Article 11(c)(ii) and Section 4.2(j) does violence to the very nature of commercial mortgage-backed security loans ("CMBS loans"), and the court's enforcement of those provisions as written will have disastrous consequences in the real estate market.  "A contract which is contrary to public policy is illegal and void."  *Badon v. Gen. Motors Corp.*, 470 N.W.3d 436, 440 (Mich. Ct. App. 1991) (citing *Federoff v. Ewing*, 192 N.W.2d 242, 245-46 (Mich. 1971)).  But for all of Defendants' orotund predictions that the sky will fall as a result of such a decision, enforcement of the Loan Agreement at issue in this case will not yield such disastrous consequences.

Defendants' oft-repeated argument boils down to the following claim about CMBS loans, bombastically asserted at oral argument:  "It is not possible for there to be flat-out personal liability . . . any time there is mortgage default.  No, that is not possible and has never happened in the history of any reported decision in the United States." (Summ. J. Hr'g Tr. 30, Nov. 16, 2011, Dkt. # 83; *see also id.* at 27 ("[A] commerical mortagage-backed security deal . . . do[es] not provide for personal liability.  100 percent of the time.  Not 90, not 95, not 99. . . . [A]sk anyone in the entire universe.") What Defendants seem not to grasp is that the court does not sit to propagate or enforce best business practices; instead, it is the court's duty to give effect to discrete agreements executed by individual parties.  When those agreements provide that the occurrence of a springing recourse event makes a borrower or its guarantor personally

liable for a commercial mortgage debt that would have otherwise been nonrecourse, the court will hold those parties to their bargain.  *See, e.g.*, *111 Debt Acquisition Holdings, LLC v. Six Ventures Ltd*, 413 F. App'x 824 (6th Cir. 2011) (affirming deficiency judgment against all guarantors when one guarantor triggered springing recourse condition by filing an unauthorized petition for bankruptcy).

Regardless of the original, or even essential, purpose of the type of transaction that Defendants wished to enter into with Morgan Stanley, they are bound by the terms of the Loan Agreement they actually signed.  Before executing the Loan Agreement, Chesterfield was free to negotiate terms favorable to its interests or acquiesce to terms favorable to Morgan Stanley's interests, but it cannot take the latter course and then void the agreement when that decision produces unfavorable consequences.  Plaintiffs acknowledge that the springing recourse events contained in the Loan Agreement are extremely, even unusually, favorable to Lender: the "fail to pay" prong of Section 4.2(j) is not ubiquitous to CMBS contracts, (*see* Pl.'s Reply Supp. Mots. Summ. J. 11-12, Dkt. # 71 (cataloguing several examples of varying springing recourse conditions related to borrower's insolvency)), despite Defendants' assurance that even a Google search will return numerous agreements containing that term, (Summ. J. Hr'g Tr. 50).[5]  But Defendants' buyer's remorse occasioned by Plaintiff's efforts to exercise the rights accorded them by the Loan Agreement is not cause for voiding the contract.  Article 11(c)(ii) and Section 4.2(j) unambiguously provide that Defendants are liable for the

---

[5] Defense counsel's invitation to "Google it" to confirm his claims calls to mind the famously reassuring statement, "You can look it up!", commonly attributed to one of two well-known twentieth century philosophers, Casey Stengel and Yogi Berra.

30

deficiency due on the Loan, and the court must enforce that agreement as a matter of law.

### 6. Damages

In a last-ditch effort to prevent summary judgment for Plaintiff, Defendants attempt to put in dispute the amount of Plaintiff's damages.  Plaintiff presents an affidavit from the special servicer of the Loan, attesting that the amount due on the Loan, including accrued interest and any other sums due under the Loan Agreement, is $12,240,108.64 as of April 1, 2011.  (Aff. Amount Due ¶ 11, Dkt. # 36-9.)  Defendants indicate in their response brief that they wish to challenge the amount of damages, but they offer no evidence to refute Plaintiff's calculations, claiming they need more discovery from Plaintiff in order to do so.  (Br. Opp. Mots. Summ. J. 38 n.15, Dkt. # 69.)  This bald assertion is not enough to create an issue of fact in the face of Plaintiff's proffered evidence of their damages.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (alleging the "mere possibility of a factual dispute is not enough" to prevent a properly supported motion for summary judgment).  The court will enter summary judgment for Plaintiff on the complaint.

### C.  Defendants' Counterclaims/Affirmative Defenses

Plaintiff also moves for summary judgment on Defendants' five counterclaims: breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); fraudulent inducement (Count IV); declaratory judgment (Count V); and reformation (Count VI).  As a first matter, the court notes that these are likely to fail as independent claims against Plaintiff, as Defendants executed a Prenegotiation Agreement with Plaintiff on March 19, 2010, acknowledging that they held no claims

31

against Plaintiff based on the Loan Agreement.  (Prenegotiation Agreement ¶ 15, p.6, Dkt. # 49-4); *see Livonia Props. Holdings, LLC v. 12840-12976 Farmington Road Holdings, LLC*, 399 F. App'x 97, 103 (6th Cir. 2010) (noting lender "would likely have valid equitable defenses of estoppel and laches" against borrower's challenge to assignment of loan agreement because borrower "expressly acknowledge[d] that '[t]he Loan Documents are in full force and effect and are binding on the Borrower in accordance with their terms" in prenegotiation agreement).[6]  However, as Defendants also present their counterclaims as affirmative defenses to the breach-of-contract claims Plaintiff states in the complaint, the court will consider the counterclaims on their merits. On those terms, they fail, and the court will grant summary judgment to Plaintiff on all counterclaims.

### 1.  Breach of Contract (Count I)

In their first counterclaim for breach of contract, Defendants allege that Plaintiff's "claim for payment of any deficiency amount from Chesterfield or Damico constitutes a breach of the Mortgage, Note, and Guaranty, which declare the Loan to be nonrecourse."  (Am. Counterclaim & 3d Party Compl. ¶ 43.)  This is nothing more than a

---

[6]In a footnote in their motion for summary judgment on the counterclaims, Plaintiff also claims that it is a holder in due course of the Note and is therefore not accountable on Defendants' claims of fraud and reformation.  (Br. Supp. Pl.'s Mot. Summ. J. Counterclaims 15 n.12, Dkt. # 49.)  However, because Plaintiff did not present the factual basis to support this argument until their reply brief, the court will not rely on it.  *See Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 682-83 (E.D. Mich. 2002) ("[I]t is not the office of a reply brief to raise issues for the first time." (citing *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993))); *cf. Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 372 n.7 (6th Cir. 2009) ("[A]rguments not raised before the district court, including arguments presented for the first time to a district court in a reply brief, generally are considered waived on appeal . . . .").

reiteration of Defendants' arguments against Plaintiff's breach-of-contract claims, so it fails for the reasons articulated above.

### 2. Breach of the Covenant of Good Faith and Fair Dealing (Count II)

Defendants have agreed to withdraw their counterclaim for breach of the covenant of good faith and fair dealing, so summary judgment is proper on that claim. (Resp. Opp'n Mots. Summ. J. 40 n.16, Dkt. # 69); *see Ulrich v. Fed. Land Bank of St. Paul*, 480 N.W.2d 910, 911-12 (Mich. Ct. App. 1991) ("Michigan does not recognize an independent tort action for an alleged breach of a contract's implied covenant of good faith and fair dealing." (citing *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 56 (Mich. 1980))).

### 3. Fraud in the Inducement (Count IV) and Reformation (Count VI)

In Counts IV and VI, Defendants state counterclaims for fraud in the inducement and reformation due to mutual mistake or fraudulent misrepresentation. Both these claims rely on Defendants' extrinsic evidence, described above, relating to their and Morgan Stanley's alleged intent that the Loan remain nonrecourse in the face of nonpayment of the mortgage debt. The most crucial evidence Defendants proffer is the affidavit of Bill Nelson, the commercial mortgage broker who acted for Chesterfield in its CMBS loan transaction with Morgan Stanley. (Nelson Aff. ¶¶ 10-11, Dkt. # 69-16.) Nelson alleges that, to complete that transaction, he interfaced with Ivan Yee, a mortgage loan officer at Morgan Stanley, who "acknowledged and agreed that the loan was non-recourse against the borrower (and any guarantor) except for certain 'bad boy acts' that are not applicable and are not alleged to have occurred in this case." (*Id.* ¶ 15.) Nelson continues:

> Mr. Yee explicitly stated that there was no personal liability of the borrower (or anyone else) in the event of non-payment of the mortgage debt. This also was both Morgan Stanley's and my intention, agreement and understanding and also was the intention, agreement and understanding that I conveyed to Chesterfield and Mr. Damico.

(*Id.*) Defendants contend that this statement, along with Damico's affidavit confirming his understanding that no personal liability resulted from nonpayment of the mortgage debt, (Damico Aff. ¶ 8, Dkt. # 69-8), show that either Morgan Stanley fraudulently misrepresented the nature of the Loan, or that a mutual mistake occurred with respect to the springing recourse event tied to nonpayment of the mortgage.

"Michigan courts sitting in equity have long had the power to reform an instrument that does not express the true intent of the parties as a result of fraud, mistake, accident, or surprise." *Johnson Family Ltd. P'ship v. White Pine Wireless, LLC*, 761 N.W.2d 353, 359 (Mich. Ct. App. 2008) (citing *Scott v. Grow*, 3 N.W.2d 254, 258-59 (Mich. 1942) and *Potter v. Chamberlin*, 73 N.W.2d 844, 848 (Mich. 1955)). To establish fraud, an innocent party must show that the offending party made (1) a material misrepresentation (2) that was false, (3) that the offending party knew to be false or made with reckless disregard as to its truth, (4) that the offending party made with the intention that the innocent party would act on it, (5) that the innocent party relied on it, and (6) that the innocent party suffered damages. *Custom Data Solutions, Inc v. Preferred Capital, Inc.*, 733 N.W.2d 102, 105 (Mich. Ct. App. 2006). Alternatively, "the party seeking reformation must prove the mutual mistake by 'clear and satisfactory' evidence, 'so as to establish the fact beyond cavil.'" *Johnson Family*, 761 N.W.2d at 363 (quoting *Crane v. Smith*, 220 N.W. 750, 751 (Mich. 1928)).

Defendants do not make a showing that will prevent summary judgment on their fraud and reformation claims.  At most, the evidence Defendants present shows that, though both they and Morgan Stanley intended to be bound by the terms of the Loan Agreement, both parties misunderstood the legal effect of the terms contained in that agreement.  (*See* Loan Application 2, Dkt. # 69-5 ("Lender's recourse for payment of obligations under the Loan Documents will be limited to the Property and the income derived therefrom, except in certain circumstances (e.g., fraud, environmental, misrepresentation) *as set forth in the Loan Documents*." (emphasis added)); Commitment Letter 13-14, Dkt. # 69-6 ("Lender's recourse for all defaults in the obligations under the Loan Documents will be limited to the Property and the income derived therefrom, except in certain circumstances (e.g., fraud, environmental, misrepresentation) *more particularly set forth in the Loan Documents* . . . ." (emphasis added)).)  Defendants cannot be deemed to have relied to their detriment on Morgan Stanley's representation of the full recourse obligations contained in the Loan Agreement, when the plain meaning of the contract said otherwise: "'one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms.'"  *Nikkel*, 596 N.W.2d at 920 (quoting *Komraus Plumbing & Heating, Inc. v. Cadillac Sands Motel, Inc.*, 195 N.W.2d 865, 868 (Mich. 1972)); *see also Montgomery v. Fid. & Guar. Life Ins. Co.*, 713 N.W.2d 801, 804 (Mich. Ct. App. 2005) ("It is well established that failure to read an agreement is not a valid defense to enforcement of a contract." (citing, *inter alia*, *Snyder v. Wolverine Mut. Motor Ins. Co.*, 204 N.W. 706, 707 (Mich. 1925))).  Similarly, when parties make "mistakes regarding the legal effect of the contract actually made," that contract "'will

35

seldom, if ever, be relieved against unless there are other equitable legal features calling for the interposition of the court.'" *Johnson Family*, 761 N.W.2d at 363 (quoting *Schmalzriedt v. Titsworth*, 9 N.W.2d 24, 28 (Mich. 1943)).  There are no equitable considerations in this case that urge the court to reform the Loan Agreement or otherwise relieve Defendants of their obligations under it, as Defendants are sophisticated parties who had the benefit of counsel when executing into the Loan Agreement.  Accordingly, the court will grant Plaintiff summary judgment on Defendants' counterclaims for fraud and reformation.

### 4.  Declaratory Judgment (Count V)

As for Defendants' request for a declaratory judgment, it is entirely redundant of Defendants' claims for legal relief.  A declaratory judgment alone cannot settle the dispute between the parties, and a ruling on the complaint and the other counterclaims provides a more effective remedy.  *See Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*, 261 F. Supp. 2d 837, 847 (E.D. Mich. 2003).  Under these circumstances, the court will not exercise its discretion to entertain a request for declaratory relief.  *See Omaha Prop. & Cas. Ins. Co. v. Johnson*, 923 F.2d 446, 447-48 (6th Cir. 1991) (outlining standard for whether district court should exercise its discretionary jurisdiction over declaratory judgment action).

### D.  Defendants' Third-Party Claims

Because the court will grant Plaintiff's motions for summary judgment, the only claims that will still remain in this case are Defendants' third-party claims against Morgan Stanley.  These include fraud/intentional misrepresentation (Count III), fraudulent inducement (Count IV), and reformation (Count VI).  For the reasons

36

articulated above with respect to Defendants' counterclaims for fraud and reformation, the court is inclined to dismiss the third-party complaint as meritless.  "[W]hen 'faced with a complaint which it believes may be subject to dismissal[,]' a district court must: '(1) allow service of the complaint upon the defendant; (2) notify all parties of its intent to dismiss the complaint; (3) give the plaintiff a chance to either amend his complaint or respond to the reasons stated by the district court in its notice of intended *sua sponte* dismissal; (4) give the defendant a chance to respond or file an answer or motions; and (5) if the claim is dismissed, state its reasons for the dismissal.'"  *Wagenknecth v. United States*, 553 F.3d 412, 417 (6th Cir. 2008) (quoting *Tingler v. Marshall*, 716 F.2d 1109, 1112 (6th Cir. 1983)).  Thus, if Defendants wish to pursue their third-party claims, the court will order them to file with the court a written explanation of why those claims should not be dismissed for the reasons conveyed in this order.

## IV.  CONCLUSION

For the reasons stated above, IT IS ORDERED that Plaintiff's "Motion for Summary Judgment" on the complaint [Dkt. # 36] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's "Motion for Summary Judgment on Defendants' Counterclaims" [Dkt. # 49] is GRANTED.

IT IS FURTHER ORDERED that Defendants must SHOW CAUSE, in writing, by **December 23, 2011**, why the third-party complaint should not be dismissed for the reasons articulated in this order.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  December 12, 2011

37

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 12, 2011, by electronic and/or ordinary mail.

  s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522