**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

51382 GRATIOT AVENUE HOLDINGS, LLC,

    Plaintiff/Counter-Defendant,

v.                                                                              Case No. 2:11-cv-12047

CHESTERFIELD DEVELOPMENT CO., LLC
and JOHN DAMICO,

    Defendants/Counter-Plaintiffs/
    Third-Party Plaintiffs,

v.

MORGAN STANLEY MORTGAGE CAPITAL
HOLDINGS, LLC,

    Third-Party Defendant.
    _____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR
RECONSIDERATION AND SETTING TELEPHONE CONFERENCE**

On December 12, 2011, the court entered an opinion and order granting Plaintiff's motions for summary judgment on the complaint and on Defendants' counterclaims in this commercial-mortgage litigation. In advance of ruling on the summary judgment motions, the court entertained extensive argumentation from both parties, including more than 150 pages of briefing, more than 2,000 pages of exhibits, and a one-hour-and-forty-five-minute oral argument. Nevertheless, Defendants have now filed a motion for reconsideration asking the court to reverse its ruling that they owed Plaintiff approximately $12,000,000 under the parties' loan agreement. Because

Defendants' motion largely reiterates arguments already considered by the court, the court will deny reconsideration.

## I. BACKGROUND[1]

This dispute arises from Defendant Chesterfield Development Co.'s ("Chesterfield's") default of a $17,000,000 commercial mortgage loan (the "Loan") held by Plaintiff. The dispositive issue determined by the court on summary judgment was whether the parties' contract (the "Loan Agreement") allowed Plaintiff to recover from Defendants the deficiency between the balance owed on the Loan and the value Plaintiff received from foreclosing on the secured property—an amount approximating $12,000,000.[2] The Promissory Note (the "Note") executed by the parties contains a provision limiting Plaintiff's, the "Lender's," ability to hold Chesterfield, the "Borrower," liable for the debt:

> Notwithstanding anything to the contrary contained in this Note, the Security Instrument or any Other Security Document (but subject to the provisions of subsections (b), (c) and (d) of this Article 11), Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Note or the Security Instrument by any action or proceeding wherein a money judgment or any deficiency judgment or other judgment establishing any personal liability shall be sought against Borrower . . . . Lender, by accepting this Note and the Security Instrument, agrees that it shall not, except as otherwise provided in this Article 11, sue for, seek or demand any deficiency judgment against Borrower . . . , in any such action or proceeding, under or by reason of or under or in connection with this Note, the Security Instrument or the Other Security Documents.

---

[1]A more thorough recitation of the factual and procedural history of this case is given in the court's summary judgment order. (*See* Op. & Order Grant. Pl.'s Mots. Summ. J. 2-4, Dec. 12, 2011, Dkt. # 90.)

[2]By Plaintiff's latest calculation, the deficiency balance of the Loan was $11,963,724.99 at the time the complaint was filed. (Br. Supp. Pl.'s Mot. J. & Discharge Receiver 3, Dkt. # 95.)

(Note art. 11(a), Dkt. # 36-3.) However, this provision is limited by certain exceptions listed in the Note, one of which reads: "[n]otwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect and the Debt shall be fully recourse to Borrower in the event that . . . Borrower . . . fails to comply with any provision of Section 4.2 of the Security Instrument (other than subsection (i), (r), or (x) thereof) . . . ." (*Id.* art. 11(c)(ii).)

On summary judgment, Plaintiff argued that Chesterfield had failed to comply with one such provision of the Security Instrument (the "Mortgage"), which states that Chesterfield shall not "become insolvent or fail to pay its debts and liabilities from its assets as the same shall become due." (Mortgage § 4.2(j), Dkt. # 36-4.) Essentially, Plaintiff averred that Chesterfield's failure to make payments on the Loan, and its resulting default under the Loan Agreement, violates Section 4.2(j) of the Mortgage. Therefore, Plaintiff contended, it could remedy Chesterfield's default not only by foreclosing the property, but also by collecting the remaining amount owed under the Loan Agreement from Chesterfield and Defendant John Damico, who executed a Guaranty Agreement (the "Guaranty") making his personal liability for the debt coextensive with Chesterfield's. (Guaranty ¶¶ 1, 4, Dkt. # 36-2 (stating Damico, as Guarantor, "hereby absolutely and unconditionally guarantees to Lender the prompt and unconditional payment" of "all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 11 of the Note").)

For their part, Defendants vociferously objected to Plaintiff's interpretation of the Loan Agreement. Instead, Defendants maintained that Chesterfield did not, and indeed

3

could not, incur personal liability for the debt solely due to nonpayment of the Loan. In Defendants' view, the mortgage debt does not factor into a determination of Chesterfield's solvency or its ability to pay its debts and liabilities under Section 4.2(j), except in the event that Chesterfield triggered a separate provision of the Note that would nullify Plaintiff's covenant not to hold Defendants personally liable for the Loan.

In its December 12, 2011 opinion and order granting summary judgment, the court analyzed Plaintiff's and Defendants' conflicting interpretation of the Loan Agreement and ultimately concluded that the plain language of the contract unambiguously supported Plaintiff's reading. The court also rejected Defendants' counterclaims, including claims for reformation due to fraud and/or mutual mistake. On January 9, 2012,[3] Defendants filed a motion for reconsideration asking the court to revisit these rulings.

## II. STANDARD

"It is an exception to the norm for the [c]ourt to grant a motion for reconsideration." *Maiberger v. City of Livonia*, 724 F. Supp. 2d 759, 780 (E.D. Mich. 2010). To obtain reconsideration, the movant must "demonstrate a palpable defect by which the court and the parties and other persons entitled to be heard on the motion have been misled," the correction of which "will result in a different disposition of the case." E.D. Mich. LR 7.1(h)(3). "A 'palpable defect' is a defect which is obvious, clear, unmistakable, manifest, or plain." *Chrysler Realty Co. v. Design Forum Architects, Inc.*,

---

[3]While, normally, a party has only fourteen days from the entry of an order to bring a motion for reconsideration, *see* E.D. Mich. LR 7.1(h)(1), the court extended the filing deadline to January 9, 2012, by stipulated order, (Order Ext. Time, Dec. 28, 2011, Dkt. # 94).

544 F. Supp. 2d 609, 618 (E.D. Mich. 2008) (citing *Mktg. Displays, Inc. v. Traffix Devices, Inc.*, 971 F. Supp. 262, 278 (E.D. Mich. 1997)).

"Generally . . . the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication." E.D. Mich. LR 7.1(h)(3); *see also Fulghen v. Potter*, No. 10-11148, 2011 WL 761499, at *1 (E.D. Mich. Feb. 25, 2011) ("The purpose of a motion for reconsideration is not 'to give an unhappy litigant one additional chance to sway the judge.'" (quoting *Pakideh v. Ahadi*, 99 F. Supp. 2d 805, 809 (E.D. Mich. 2000))). "A party may not utilize a motion for reconsideration to introduce new legal theories for the first time, to raise legal argumentation which could have been heard during the pendency of the previous motion, or to present evidence that could have been adduced during the pendency of the original motion." *DiPonio Constr. Co. v. Int'l Union of Bricklayers, Local 9*, 739 F. Supp. 2d 986, 1004 (E.D. Mich. 2010) (internal quotation marks omitted).

### III. DISCUSSION

In support of their motion for reconsideration, Defendants assert that the court's December 12, 2011 opinion and order contains three palpable defects: (1) a failure to properly consider Defendants' mutual mistake and fraud arguments; (2) a misunderstanding of Defendants' proposed interpretation of Section 4.2(j) of the Mortgage, in particular Defendants' interpretation of the phrase "from its assets"; and (3) the use of conflicting definitions of the terms "debts" and "liabilities" when interpreting Section 4.2(j) of the Mortgage. The court finds that these arguments "merely present

5

the same issues ruled upon by the court" in its prior order. E.D. Mich. LR 7.1(h)(3).

Consequently, the court will deny Defendants' motion.

### A. Mutual Mistake and Fraud

Defendants first aver that the court's grant of summary judgment to Plaintiff on their counterclaim for reformation due to mutual mistake or fraud was a palpable defect in the court's summary judgment order. Although Defendants claim the court gave "short shrift" to their reformation arguments, (Br. Supp. Defs.' Mot. Recons. 3, Dkt. # 96), the court did in fact consider Defendants' claims even though it ultimately rejected them:

> In Counts IV and VI, Defendants state counterclaims for fraud in the inducement and reformation due to mutual mistake or fraudulent misrepresentation. Both these claims rely on Defendants' extrinsic evidence, described above, relating to their and Morgan Stanley's alleged intent that the Loan remain nonrecourse in the face of nonpayment of the mortgage debt. The most crucial evidence Defendants proffer is the affidavit of Bill Nelson, the commercial mortgage broker who acted for Chesterfield in its CMBS loan transaction with Morgan Stanley. (Nelson Aff. ¶¶ 10-11, Dkt. # 69-16.) Nelson alleges that, to complete that transaction, he interfaced with Ivan Yee, a mortgage loan officer at Morgan Stanley, who "acknowledged and agreed that the loan was non-recourse against the borrower (and any guarantor) except for certain 'bad boy acts' that are not applicable and are not alleged to have occurred in this case." (*Id.* ¶ 15.) Nelson continues:
>
>> Mr. Yee explicitly stated that there was no personal liability of the borrower (or anyone else) in the event of non-payment of the mortgage debt. This also was both Morgan Stanley's and my intention, agreement and understanding and also was the intention, agreement and understanding that I conveyed to Chesterfield and Mr. Damico.
>
> (*Id.*) Defendants contend that this statement, along with Damico's affidavit confirming his understanding that no personal liability resulted from nonpayment of the mortgage debt, (Damico Aff. ¶ 8, Dkt. # 69-8), show that either Morgan Stanley fraudulently misrepresented the nature of the Loan,

6

or that a mutual mistake occurred with respect to the springing recourse event tied to nonpayment of the mortgage.

"Michigan courts sitting in equity have long had the power to reform an instrument that does not express the true intent of the parties as a result of fraud, mistake, accident, or surprise." *Johnson Family Ltd. P'ship v. White Pine Wireless, LLC*, 761 N.W.2d 353, 359 (Mich. Ct. App. 2008) (citing *Scott v. Grow*, 3 N.W.2d 254, 258-59 (Mich. 1942) and *Potter v. Chamberlin*, 73 N.W.2d 844, 848 (Mich. 1955)). To establish fraud, an innocent party must show that the offending party made (1) a material misrepresentation (2) that was false, (3) that the offending party knew to be false or made with reckless disregard as to its truth, (4) that the offending party made with the intention that the innocent party would act on it, (5) that the innocent party relied on it, and (6) that the innocent party suffered damages. *Custom Data Solutions, Inc v. Preferred Capital, Inc.*, 733 N.W.2d 102, 105 (Mich. Ct. App. 2006). Alternatively, "the party seeking reformation must prove the mutual mistake by 'clear and satisfactory' evidence, 'so as to establish the fact beyond cavil.'" *Johnson Family*, 761 N.W.2d at 363 (quoting *Crane v. Smith*, 220 N.W. 750, 751 (Mich. 1928)).

Defendants do not make a showing that will prevent summary judgment on their fraud and reformation claims. At most, the evidence Defendants present shows that, though both they and Morgan Stanley intended to be bound by the terms of the Loan Agreement, both parties misunderstood the legal effect of the terms contained in that agreement. (*See* Loan Application 2, Dkt. # 69-5 ("Lender's recourse for payment of obligations under the Loan Documents will be limited to the Property and the income derived therefrom, except in certain circumstances (e.g., fraud, environmental, misrepresentation) *as set forth in the Loan Documents*." (emphasis added)); Commitment Letter 13-14, Dkt. # 69-6 ("Lender's recourse for all defaults in the obligations under the Loan Documents will be limited to the Property and the income derived therefrom, except in certain circumstances (e.g., fraud, environmental, misrepresentation) *more particularly set forth in the Loan Documents* . . . ." (emphasis added)).) Defendants cannot be deemed to have relied to their detriment on Morgan Stanley's representation of the full recourse obligations contained in the Loan Agreement, when the plain meaning of the contract said otherwise: "'one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms.'" [*Farm Bureau Mut. Ins. Co. of Mich. v.*] *Nikkel*, 596 N.W.2d [915,] 920 [(Mich. 1999)]; *see also Montgomery v. Fid. & Guar. Life Ins. Co.*, 713 N.W.2d 801, 804 (Mich. Ct. App. 2005) ("It is well established that failure to read an agreement is not a valid defense to enforcement of a contract." (citing, *inter alia, Snyder v. Wolverine Mut. Motor Ins. Co.*, 204 N.W. 706, 707 (Mich. 1925))). Similarly, when parties make "mistakes regarding the legal effect of the contract actually made," that contract "'will seldom, if ever, be relieved against unless there are other equitable legal features calling for the

> interposition of the court.'" *Johnson Family*, 761 N.W.2d at 363 (quoting *Schmalzriedt v. Titsworth*, 9 N.W.2d 24, 28 (Mich. 1943)). There are no equitable considerations in this case that urge the court to reform the Loan Agreement or otherwise relieve Defendants of their obligations under it, as Defendants are sophisticated parties who had the benefit of counsel when executing [. . .] the Loan Agreement. Accordingly, the court will grant Plaintiff summary judgment on Defendants' counterclaims for fraud and reformation.

(Op. & Order Grant. Pl.'s Mots. Summ. J. 33-36.)

Defendants contend that the court erroneously concluded that the evidence presented did not merit reformation under relevant case law from the Michigan courts, given Nelson's statements that neither he nor Yee intended for the Loan Agreement to result in personal liability for Chesterfield or Damico in the event of nonpayment of the mortgage debt. Even assuming that Defendants could obtain testimony from Yee that confirms Nelson's story, they have not brought forth "'clear and satisfactory' evidence" of mutual mistake, *Johnson Family*, 761 N.W.2d at 363 (quoting *Crane*, 220 N.W. at 751), let alone evidence of a "material misrepresentation" on the part of Morgan Stanley, *Custom Data Solutions*, 733 N.W.2d at 105. The Loan Application and Commitment Letter relied on by Defendants reflect the parties' intent to be bound by the terms of the Loan Agreement, (*see* Loan Application 2; Commitment Letter 13-14), and even Nelson and Yee's conversation contemplates full recourse liability for certain "bad boy acts," (Nelson Aff. ¶ 15). As Defendants themselves point out, commercial mortgage-backed security loans of the type at issue here regularly contain springing recourse conditions, such as insolvency, that threaten a borrower's status as a bankruptcy-remote entity. (Br. Supp. Defs.' Mot. Recons. 8-9 (quoting *Wells Fargo Bank, NA v. Cherryland Mall Ltd. P'ship*, --- N.W.2d ----, 2011 WL 6785393 (Mich. Ct. App. 2011)).) Absent corroboration by more compelling evidence, the affidavits of

8

Nelson and Damico regarding their own understandings and oral communications are not enough to overcome the unambiguous language of the Loan Agreement—especially on a motion for reconsideration. *Cf. JP Morgan Chase Bank, NA v. Winget*, No. 08-13845, 2011 WL 6181438, at *8-9 (E.D. Mich. Dec. 13, 2011) (concluding borrowers created genuine issue of material fact on reformation claim based on multiple pieces of testimonial and documentary evidence); *Bankers Trust (Del.) v. 236 Beltway Investment*, 865 F. Supp. 1186, 1198-99 (E.D. Va. 1994) (denying summary judgment to lender on borrower's claim that loan agreement should be reformed to include nonrecourse provision, when borrower presented affidavits from multiple individuals involved in negotiation of loan agreement on behalf of both borrower and lender, as well as documents reflecting parties' understanding that loan was nonrecourse written prior to and after execution of loan agreement).

Additionally, Defendants allege error in the court's reliance on *Johnson Family* for the proposition that "mistakes regarding the legal effect of the contract actually made . . . 'will seldom, if ever, be relieved against unless there are other equitable legal features calling for the interposition of the court.'" 761 N.W.2d at 363 (quoting *Schmalzriedt*, 9 N.W.2d at 28). Defendants argue that this statement has been abrogated by later Michigan Supreme Court cases. *See Ulrick v. Burge*, 86 N.W.2d 543, 548 (Mich. 1957) ("If reading a written instrument (which both parties thereto admit did not express their intention) precludes reformation thereof on the ground of mutual mistake, then we wipe out hundreds of years of equity and elevate the scrivener to the ermine."); *Frankowich v. Frankowich*, 35 N.W.2d 478, 480 (Mich. 1949) ("'Where a written instrument fails to express the intention of the parties because of a mutual

mistake as to the interpretation or legal effect of the words of the writing, though there is no misapprehension as to what words have been used, reformation is allowed.'" (quoting *Scott v. Grow*, 3 N.W.2d 254, 258 (Mich. 1942))). Alternatively, Defendants maintain that the mistake they allege is actually a mistake in reducing to writing "the parties['] inten[t] to memorialize a non-recourse loan with limited exceptions for bad-boy acts," which they claim is always grounds for reformation. (Br. Supp. Defs.' Mot. Recons. 6); *see Schmalzriedt*, 9 N.W.2d at 28 ("[W]here the mistake is not in the contract itself, but terms are used in or omitted from the instrument which give it a legal effect not intended by the parties, and different from the contract actually made, equity will always grant relief unless barred on some other ground, by correcting the mistake so as to produce a conformity of the instrument to the agreement." (internal quotation marks omitted)).

As discussed above, the court's rejection of Defendants' reformation claim was based upon their failure to adduce enough evidence of mutual mistake or fraud, and therefore the court's decision does not rest on the equitable considerations it also cited. At this point, the court will note only that reformation remains an equitable doctrine. *See, e.g.*, *Shay v. Aldrich*, 790 N.W.2d 629, 660 & n.20 (Mich. 2010) (Markman, J., dissenting). As such, it should complement, rather than supersede, the established legal principle that "one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms." *Nikkel*, 596 N.W.2d at 920 (internal quotation marks omitted). The court's expression of this idea in its summary judgment opinion is not a palpable defect subject to reconsideration.

## B. "From Its Assets"

The second palpable defect Defendants purportedly identify is the court's rejection of their interpretation of the phrase "from its assets" in Section 4.2(j) of the Mortgage.[4] After considering Defendants' exhaustive presentation of this argument in their briefing and oral argument of Plaintiff's motions for summary judgment, the court found it unsupported by the plain language of the Loan Agreement:

> Defendants respond that, even if the entirety of the mortgage debt falls within the "debts and liabilities" referred to in Section 4.2(j), Chesterfield never "fail[ed] to pay [the mortgage debt] . . . from its assets as the same shall become due." Defendants assert that "Borrower does not violate section 4.2(j) simply by failing to pay its debts and liabilities as they become due"; rather, "breach occurs only if Borrower fails to pay its debts and liabilities *from its assets*," and Chesterfield did not breach because "it has used the assets that it has to pay its debts and liabilities." (Br. Opp. Mots. Summ. J. 26 n.13, [Dkt.] # 69.) Put another way, Chesterfield cannot "fail to pay its debts and liabilities" within the meaning of Section 4.2(j) if it runs out of assets with which to pay. This argument is entirely unavailing. Defendants maintain that, because Plaintiff contends that breach occurs if Chesterfield fails to pay its debts and liabilities as they become due, Plaintiff reads the phrase "from its assets" out of Section 4.2(j), and Defendants' interpretation is therefore superior. However, interpreting Section 4.2(j) to prohibit the nonpayment of "debts and liabilities" only when Chesterfield has assets available would negate the phrase "as the same shall become due." Section 4.2(j) must require Chesterfield to pay its debts and liabilities *both* "from its assets" *and* "as the same shall become due," otherwise one of these phrases is written out of the contract. *Associated Truck Lines* [*v. Baer*], 77 N.W.2d [384,] 386 [(Mich. 1956)] (listing as "cardinal principle[s] of construction" that "a contract is to be construed as a whole" and "every word in it is to be given effect"). Chesterfield had an obligation under the Loan Agreement to make a set monthly payment for a period of years, and that payment "bec[a]me due" on the first of every month. On December 1, 2009,

---

[4]In their discussion of this alleged error, Defendants also assert, in a footnote, that the court should have accepted their argument that Chesterfield could not have violated Section 4.2(j) of the Mortgage by failing to pay a single debt or liability, since that provision refers to "debts and liabilities" in the plural. (Br. Supp. Defs.' Mot. Recons. 11 n.5.) As Defendants do not bother responding to the analysis behind the court's prior rejection of this argument, (*see* Op. & Order Grant. Pl.'s Mots. Summ. J. 25-26), the court will not consider it anew.

11

> Chesterfield failed to pay this obligation, from its assets or otherwise, as required.

(Op. & Order Grant. Pl.'s Mots. Summ. J. 24-25.)

Defendants' challenge to this passage of the court's opinion amounts to little more than an attempt to reargue this issue on reconsideration, and the court finds Defendants' contentions no more convincing now than when they were first asserted. Defendants claim that to interpret Section 4.2(j) as requiring Chesterfield to pay its debts and liability *both* "from its assets" *and* "as the same shall become due" would "turn[] section 4.2(j) into two discrete provisions, one of which would read that Chesterfield shall not 'fail to pay its debts and liabilities from its assets' and the other that Chesterfield shall not 'fail to pay its debts and liabilities as the same shall become due.'" (Br. Supp. Defs.' Mot. Recons. 10 (footnote omitted).)[5]

As the court has explained, its interpretation of Section 4.2(j) is necessary to give effect to both the phrases "from its assets" and "as the same shall become due." Defendants have argued *ad infinitum* their position that the phrase "from its assets" trumps "as the same shall become due," such that Chesterfield has no obligation at all under Section 4.2(j) to pay any of its debts and liabilities if it has exhausted its assets.

---

[5]Again in a footnote, Defendants also maintain that requiring Chesterfield to pay its debts and liabilities as the same shall become due under Section 4.2(j) is redundant of Section 4.2(i) of the Mortgage, which prohibits Chesterfield from "'incur[ring] any debt . . . provided that such debt is not evidenced by a note and is paid when due.'" (Br. Supp. Defs.' Mot. Recons. 10 n.4 (quoting Mortgage § 4.2(i)).) In the court's view, this constitutes "legal argumentation which could have been heard during the pendency of the previous motion" and is therefore not cognizable on reconsideration. *DiPonio Constr. Co.*, 739 F. Supp. 2d at 1004 (internal quotation marks omitted). Moreover, the argument fails on its own terms, as Section 4.2(j) contains a broader obligation with respect to Chesterfield's payment of debt than Section 4.2(i): the latter speaks only to debts incurred after the execution of the Loan Agreement, while the former would cover debts and liabilities that predated the Loan Agreement.

But Defendants have yet to explain how this interpretation aligns with the plain meaning of Section 4.2(j). The true focus of the provision is upon a contemplated *failure to pay*, not upon the nature of debts or the source of assets. When the due date for the payment of a debt comes and goes without that debt being paid from Chesterfield's assets, Chesterfield has "fail[ed] to pay its debts and liabilities from its assets as the same shall become due" in the apparent, common-sense meaning of those words—regardless of whether Chesterfield possessed sufficient assets to make that payment. Section 4.2(j) contains no limitation based on the assets Chesterfield has available to pay its debts and liabilities, and, for all the time Defendants devoted to this issue, they have not provided a sufficient justification for reading such a restriction into that provision.

Defendants further contend that the court's interpretation makes it "at least arguable that *any* payment default by Chesterfield" would violate Section 4.2(j) and thereby render the exculpation promised in Article 11(a) of the Note illusory. (Br. Supp. Defs.' Mot. Recons. 10.) Again, the court has already entertained this argument and deemed it unavailing, as Chesterfield could still claim the protection of Article 11(a) if it defaulted on the Loan in a manner unrelated to the nonpayment of a debt or liability:

> As Plaintiff recognizes, its interpretation of the "fail to pay" prong of Section 4.2(j) is far-reaching—broad enough, perhaps, to be triggered by a failure to timely pay even a trivial, outstanding financial obligation like a utility bill. However, it does not nullify Article 11(a)'s covenant not to pursue recourse liability. Defendants' argument assumes that the only way Chesterfield can default on the Loan is through nonpayment, when in fact Section 10.1 of the Mortgage proscribes numerous Events of Default, some of which do not involve nonpayment of a debt or liability. (*See, e.g.*, Mortgage § 10.1(c), (e), (k), (*l*).) Likewise, the acceleration of the Loan due to default does not necessarily violate the "insolvent" prong of Section 4.2(j). Rather, such a violation depends upon the relative values of the Property and

13

> the amount due on the Loan at the time of default; while, as a result of Chesterfield's default, its liabilities exceeded the value of its assets because it owed more on the Loan than the Property was worth, insolvency would not have resulted if the value of the Property had been greater than the balance owing on the Loan. Therefore, even if Defendants are correct that any default of the Loan Agreement due to nonpayment of the Loan will result in recourse liability under Article 11(c)(ii) and Section 4.2(j), this result does not write Article 11(a) out of the Loan Agreement. For example, Section 4.2(j) would not have triggered Defendants' recourse liability had Chesterfield's default occurred due to its failure to maintain adequate insurance on the Property, (*see* Mortgage § 10.1(c)), and the accelerated Loan balance had been less than the value of the Property. Therefore, Plaintiff's reading of Section 4.2(j) can be "harmonized" with Article 11(a), and does not violate the interpretative principle that "no part [of a contract] is to be taken as eliminated or stricken by some other part unless such a result is fairly inescapable." *Associated Truck Lines*, 77 N.W.2d at 386.

(Op. & Order Grant. Pl.'s Mots. Summ. J. 17-18.)

Defendants take issue with this reasoning, maintaining that the analysis of whether Chesterfield became insolvent or failed to pay its debts and liabilities under Section 4.2(j) "would be identical regardless of whether the underlying default was caused by the failure to make a mortgage payment or by . . . any of the [other] Events of Default contained in section 10.1 of the Mortgage." (Br. Supp. Defs.' Mot. Recons. 13.) That is not correct. While the occurrence of any Event of Default would have allowed Plaintiff to accelerate the unpaid debt, (Mortgage § 11.1(a)), an acceleration of that debt would not, in every circumstance, result in Chesterfield's insolvency or lead to a failure to pay a debt or liability in violation of Section 4.2(j). Defendants' assertion to the contrary rests upon their assumption that "[o]nce the mortgage debt is accelerated (for whatever reason), a borrower obviously would never be able to make the entire accelerated payment of $17,000,000 plus." Defendants rely on an unsound premise. Upon default, Plaintiff could only demand payment of the *unpaid* portion of the mortgage

14

debt which, depending on how far into the term of the loan default occurred, would be less –perhaps far less– than the original, $17,000,000 Loan. For example, if Chesterfield defaulted when it owed only $1,000,000 on the Loan, it seems very unlikely that acceleration of that remaining debt would result in a liability greater than the value of the property, and Chesterfield could discharge the debt by surrendering the property or by simply paying the accelerated balance. In that circumstance, default alone would not amount to a violation of Section 4.2(j) and would not lead to the nullification of Article 11(a)'s nonrecourse provision. Rather, to trigger Defendants' personal liability, a condition enumerated in Article 11(b) or (c) would also have to occur. As explained at length in the court's summary judgment opinion, it was Chesterfield's failure to make mortgage payments as required by the Note, not Plaintiff's acceleration of the Loan after default, that ran afoul of Section 4.2(j) of the Mortgage and Article 11(c) of the Note. Defendants have not shown that the court palpably erred in so determining.

### C. "Debts" and "Liabilities"

Defendants' final allegation of a palpable defect relates to the definitions of "debts" and "liabilities" the court employs when interpreting Section 4.2(j) of the Mortgage. Their argument is based on the following analysis by the court in its summary judgment opinion:

> To evaluate Defendants' interpretation, it is crucial to distinguish two distinct concepts: Chesterfield's obligation to pay the Loan and Plaintiff's right to recovery in the event of default. As discussed above, Chesterfield unquestionably has an obligation to repay the Loan in full, as it "unconditionally promise[d[ to pay" the Loan according to the terms of the Loan Agreement. (Note art. 1(b).) On the other hand, Article 11(a) limits Plaintiff's ability to "enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Note or the Security Instrument" by limiting Defendants' recourse liability to the events enumerated in Article

15

> 11(b) and (c). (*Id.* art. 11(a).) The crux of Defendants' argument is that Chesterfield's obligation to pay the Loan was no greater than Plaintiff's right to a recovery in the event of default. Given the limitation on that right to recovery in Article 11(a), Defendants reason, Chesterfield's obligation did not exceed the value of the Property and thus could never cause a violation of Section 4.2(j).
>
> Defendants' contention gains some traction in the context of a solvency analysis under the "insolvent" prong of Section 4.2(j), which involves an assessment of Chesterfield's "debt" according to the specialized, legal definition of "liability on a claim." That definition of "debt" limits Chesterfield's obligation to pay the Loan to Plaintiff's right to recovery. Therefore, as the Defendants' affidavit of CPA Harry Cendrowski illustrates, if the mortgage debt was a nonrecourse liability at the time of Chesterfield's default on the Loan, the amount of that liability is limited to "the fair value of the property which collateralizes the loan" and Chesterfield's debts did not exceed its assets. (Cendrowski Aff. ¶¶ 8, 12, Dkt. # 69-15.)
>
> However, Defendants' reasoning falls flat in the face of the "fail to pay" prong of Section 4.2(j), which is broader than the "insolvent" prong. *Compare* Mich. Comp. Laws § 566.32(1) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."), *with id.* § 566.32(2) ("A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent."). As discussed above, a "debt" is "anything (as money, goods, or service) which one person is under obligation to pay or render to another," [*Oxford English Dictionary* (2d ed. 1989)], and a "liability" is a "financial or pecuniary obligation," [*Black's Law Dictionary* (9th ed. 2010)]. These definitions, unlike the operative definition of "debt" in the insolvency context, do not limit Chesterfield's obligation to pay to their lenders' legal right to recovery. To hold otherwise would collapse these two separate concepts in a manner not allowed on the face of the Loan Agreement, which specifically provides in Article 11(a) that "[t]he provisions of this Article 11 shall not . . . constitute a waiver, release or impairment of any obligation evidenced or secured by this Note, the Security Instrument or the Other Security Documents delivered to Lender." (Note art. 11(a)(i); *cf. id.* art. 11(d) ("Nothing herein shall be deemed to be a waiver of any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provision of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness secured by the Security Instrument . . . .").)

(Op. & Order Grant. Pl.'s Mots. Summ. J. 22-23.)

Defendants aver that the court incorrectly, "without any support in the loan documents themselves and without citing any legal precedent," used the *Oxford English Dictionary* definition of "debt" to interpret the language "fails to pay its debts and

16

liabilities from its assets as the same shall become due" in Section 4.2(j). (Br. Supp. Defs.' Mot. Recons. 14.) Instead, Defendants contend, the court should have defined "debt" as "liability on a claim," *see* Mich. Comp. Laws § 566.31(e); *see also* 11 U.S.C. § 101(12), or, in the alternative, the court should have found the term ambiguous and therefore a question of fact for the jury, *see Comerica Inc. v. Zurich Am. Ins. Co.*, 498 F. Supp. 2d 1019, 1027 (E.D. Mich. 2007).

Although Defendants apparently did not appreciate this fact, the court did rely on legal precedent in deciding to employ the *Oxford English Dictionary* definition. Namely, the court was mindful of an elementary canon of contract interpretation: "[i]n ascertaining the meaning of a contract, [the court] give[s] the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 28 (Mich. 2005) (citing *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003)). More specifically, "[a] term in a statute or contract is not rendered ambiguous because it is undefined. Rather, words are construed according to their plain and ordinary meaning, with consultation to a dictionary if necessary, unless it is clear a term is a legal term of art having peculiar meaning." *Macomb Cnty. v. AFSCME Council 25 Locals 411 & 893*, --- N.W.2d ----, 2011 WL 4374991 (Mich. Ct. App. 2011) (Markey, J., dissenting) (citing *Brackett v. Focus Hope, Inc.*, 753 N.W.2d 207, 211 (Mich. 2008), and *Terrien v. Zwit*, 648 N.W.2d 602, 613 (Mich. 2002)). While "insolvent" is clearly a legal term of art having a peculiar meaning, *see Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1013 (3d Cir. 1980), "debt" is not. Thus, it is proper to interpret "debt" as used in Section 4.2(j) according to its plain and ordinary meaning, and "[t]he common usage of a nonlegal

term is to be found in a dictionary." *Twichel v. MIC Gen. Ins. Corp.*, 676 N.W.2d 616, 623 (Mich. 2004) (Cavanagh, J., concurring in part and dissenting in part) (citing *Sands Appliance Servs., Inc. v. Wilson*, 615 N.W.2d 241, 246 (Mich. 2000)). Section 4.2(j) unambiguously refers to "debts" in the sense of "anything (as money, goods, or service) which one person is under obligation to pay or render to another," and it was not palpable error to so interpret the Loan Agreement.

Defendants also argue that, even using the *Oxford English Dictionary* definition of "debt," Chesterfield's failure to make mortgage payments did not violate Section 4.2(j) because "Chesterfield did not have an *obligation* to pay the mortgage debt, *except to the extent it had assets to do so*." (Br. Supp. Defs.' Mot. Recons. 15.) At this juncture, the court sees no need to further discuss its justifications for rejecting Defendants' oft-repeated refrain that Section 4.2(j) obligated Chesterfield to meet its financial obligations only when it had assets available. The court does not now, nor has it ever, disputed Defendants' more general assertion that, when a debt is nonrecourse, a borrower or guarantor does not have an obligation to repay that debt from its personal assets. (*See id.* 15-16 (collecting cases).) The point of contention has always been whether the nonrecourse character of the Loan was nullified under Article 11(c)(ii) of the Note and Section 4.2(j) of the Mortgage, once Chesterfield violated its "unconditional[] promise to pay . . . the principal sum of ($17,000,000.00), . . . with interest . . . in accordance with the terms of th[e] Note," (Note pmbl), by failing to make "constant payment[s] of . . . ($103,483.14) . . . on the first day of each calendar month" between June 1, 2005 and April 1, 2015, (*id.* art. 1(b)). The court settled this dispute in favor of

18

Plaintiff, and Defendants have not met their burden for demonstrating that the court should reconsider its decision.

## IV.  CONCLUSION

For the reasons discussed above, IT IS ORDERED that Defendants' motion for reconsideration [Dkt. # 96] is DENIED.

IT IS FURTHER ORDERED that counsel for Plaintiff, Defendants, and Third-Party Defendant shall participate in a telephone conference on **January 26, 2012, at 10:30 a.m.**  The court will place the telephone call.  During the conference, counsel for Plaintiff and Defendants should be prepared to discuss Plaintiff's pending "Motion for Judgment and Discharge of Receiver" [Dkt. # 95].  Additionally, counsel for Defendants and Third-Party Defendant should be prepared to update the court on their efforts to resolve Defendants' third-party claims.

      s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  January 24, 2012


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, January 24, 2012, by electronic and/or ordinary mail.

      s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C2 ORDERS\11-12047.51382GRATIOTAVEHOLDINGS.Reconsideration.set.3.wpd